# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: August 31, 2021

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| SAMUEL HUTCHENS, | \* | No. 17-797V |
| | \* | |
| Petitioner, | \* | Special Master Sanders |
| | \* | |
| v. | \* | |
| | \* | |
| SECRETARY OF HEALTH | \* | Fact Hearing; Onset of Injury; |
| AND HUMAN SERVICES, | \* | Influenza ("Flu") Vaccine; Shoulder Injury |
| | \* | Related to Vaccine Administration |
| Respondent. | \* | ("SIRVA") |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Maximillian J. Muller,* Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Christine M. Becer,* U.S. Department of Justice, Washington, DC, for Respondent.

### FACT RULING[1]

On June 14, 2017, Samuel Hutchens ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program.[2] 42 U.S.C. §§ 300aa-1 to -34 (2012). Petitioner alleged that he developed a left-sided shoulder injury related to vaccine administration ("SIRVA")[3] as a result of an influenza ("flu") vaccine he received on October 17, 2014. Pet. at 1, ECF No. 1. At this time, I find it is necessary to make a factual determination as to the date of onset of Petitioner's left-sided shoulder pain. After carefully analyzing the information in the record and the testimony provided during the fact hearing, I find that although Petitioner's evidence is inconsistent at times, Petitioner established by a preponderant standard that he experienced an onset of left shoulder pain relevant to this claim beginning on the day of his flu vaccination.

---

[1] This fact ruling shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted fact ruling. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

[3] At the time of filing of Petitioner's petition, he alleged that he suffered from "left shoulder impingement, adhesive capsulitis, tendinopathy, tendinitis, superior labral tearing, and [] debilitating pain, weakness, and restricted range of motion[.]" Pet. at 1.

## I.    Procedural History

On June 14, 2017, Petitioner filed his petition alleging that he suffered a left-sided SIRVA as a result of the flu vaccine he received on October 17, 2014. Pet. at 1. The same day, Petitioner filed five exhibits consisting of medical records and his first affidavit. Pet'r's Exs. 1–5, ECF Nos. 1-4–1-8. On July 7, 2017, Petitioner filed his vaccination record and a statement of completion. Pet'r's Ex. 6, ECF Nos. 7-1, 8. On July 26, 2017, Petitioner filed an amended petition. ECF No. 9. The same day, Petitioner filed a supplemental affidavit. Pet'r's Ex. 7, ECF No. 10-1. Petitioner filed an amended statement of completion on August 21, 2017. ECF No. 12.

Respondent filed his Rule 4(c) report on December 29, 2017. Resp't's Report, ECF No. 16. In his report, Respondent argued that this case should be dismissed because Petitioner has not shown by a preponderance of the evidence that he suffered a shoulder injury within forty-eight hours of the injection as required by the Table. *Id.* at 5. Respondent also argued Petitioner has failed to meet his evidentiary burden of establishing that his flu vaccine was the cause-in-fact of his alleged shoulder injury. *Id.*

On January 10, 2018, I held a status conference with the parties pursuant to Vaccine Rule 5 and discussed the evidence filed to-date. *See* Min. Entry, docketed Jan. 10, 2018. During the status conference, I "questioned whether Petitioner agree[d] with Respondent's contention that Petitioner did not exhibit symptoms of SIRVA until approximately [eleven] months after his flu vaccine." Order at 1, ECF No. 17. Petitioner indicated that he complained of shoulder pain to his treating physician in December 2014, but this was not documented in his record. *Id.* Therefore, Petitioner noted that he intended on producing affidavits "to show a more-recent onset consistent with a Vaccine Table injury." *Id.* In response to my questioning, Petitioner "agreed that an onset of eleven months would preclude a finding that [he] suffered from SIRVA." *Id.* At the conclusion of the conference, I ordered Petitioner to submit affidavits corroborating the onset of his symptoms. *Id.*

On January 25, 2018, Petitioner filed three witness affidavits from Ms. Linda Bode, Ms. Tammy Gomes, and Ms. Beth Smith. Pet'r's Exs. 8–10, ECF Nos. 18-2–18-4. On March 28, 2018, Respondent filed a status report indicating that he had reviewed Petitioner's affidavits but maintained his position put forth in his Rule 4(c) report. ECF No. 20.

I held a status conference with the parties on April 24, 2018. *See* Min. Entry, docketed Apr. 24, 2018. During the status conference, Petitioner noted he did not obtain an affidavit from his treating physician that showed that he complained of left-sided shoulder pain in December 2014. Order at 1, ECF No. 21. Petitioner maintained that he complained of shoulder pain in 2014 but that it was not recorded. *Id.* Petitioner's counsel also stated that she wrote the three witness affidavits filed on January 25, 2018, after communicating with the affiants and sending them the documents for their review and signatures. *Id.* I explained that the affidavits filed to-date "lack[ed] context due to their template format . . . [and] read more like affirmations than unprompted recollections." *Id.* Following the status conference, I ordered Petitioner to submit more detailed affidavits regarding the onset of Petitioner's SIRVA. *Id.* at 2.

2

On April 27, 2018, Petitioner filed an email documenting the date of his flu vaccination. Pet'r's Ex. 11, ECF No. 22-2. Three days later, on April 30, 2018, Petitioner filed a supplemental witness affidavit from Ms. Tammy Gomes. Pet'r's Ex. 12, ECF No. 23-2. On May 9, 2018, Petitioner filed additional evidence consisting of a hotel confirmation from the weekend of October 24, 2014, and a supplemental witness affidavit from Ms. Beth Smith. Pet'r's Exs. 13–14, ECF Nos. 24-2–24-3. On May 22, 2018, Petitioner filed a third, detailed supplemental affidavit and an amended statement of completion. Pet'r's Ex. 15, ECF Nos. 25-2, 26.

I held a status conference with the parties on August 30, 2018. *See* Min. Entry, docketed Aug. 31, 2018. During the conference, the parties discussed Petitioner's most recent affidavit. Order at 1, ECF No. 27. Respondent noted that "the affidavit did not address the concerns previously raised regarding onset and gaps in treatment." *Id.* The parties expressed that a fact hearing may eventually be necessary, but Petitioner requested time to submit additional evidence, including but not limited to over-the-counter treatment and/or employment records. *Id.*

After one extension of time to file additional evidence, Petitioner filed a motion to issue a subpoena for his personnel file. *See* ECF Nos. 28, 29. I granted Petitioner's motion on November 26, 2018. Order, ECF No. 30. On November 29, 2018, Petitioner filed a second motion for extension of time to file additional evidence, which I granted the same day. ECF Nos. 31, 32. On December 6, 2018, Petitioner filed an exhibit reflecting his purchase of a topical pain reliever, DMSO, in July 2015. Pet'r's Ex. 16, ECF No. 33-2. The same day, Petitioner filed a fourth, detailed supplemental affidavit regarding his gap in treatment. Pet'r's Ex. 17, ECF No. 33-3. Petitioner also noted that his left-sided shoulder pain limited his work abilities after receiving the flu vaccine. *Id.* On December 7, 2018, I ordered Petitioner to submit additional affidavits from his employer and/or co-workers describing the effect of Petitioner's shoulder injury on his work abilities to corroborate the assertions made in Petitioner's affidavit. Order, ECF No. 34. Petitioner filed his personnel file, followed by an amended statement of completion on December 17, 2018. Pet'r's Ex. 18, ECF Nos. 35-2, 36. Petitioner's personnel file did not contain any "documentation . . . related to his vaccine injury[]" and he "did not miss work at any time because of the [alleged] injury." Pet'r's Ex. 18 at 1.

On March 5, 2019, Respondent filed a status report indicating that he had reviewed the exhibits filed to-date and maintained his position articulated in his Rule 4(c) report. ECF No. 37. Respondent recommended that the parties schedule a fact hearing to address the issue of onset. *Id.*

I scheduled this matter for a one-day onset hearing on November 20, 2019. ECF No. 41. The hearing was held as scheduled on that date. *See* Min. Entry, docketed Feb. 20, 2020. At the time of the hearing, Petitioner was represented by Ms. Shealene Mancuso. Mr. Maximillian Muller was substituted as counsel on November 30, 2020. ECF No. 45.

This matter is ripe for consideration.

3

## II.   Summary of Relevant Evidence

### a.   Medical Records

Petitioner's medical records confirm that he received the flu vaccine at issue on October 17, 2014. Pet'r's Ex. 6 at 1, ECF No. 7. Petitioner's immunization record indicates that he received the vaccine in his left shoulder. *Id.* At the time of vaccination, Petitioner was sixty-three years old and working as a carpenter. *Id.*

On December 8, 2014, Petitioner presented to physician's assistant Mr. Josh Anderson at Crossroads Medical with complaints of left-sided chest and neck pain. Pet'r's Ex. 2 at 1–3, ECF No. 1-5. Petitioner reported that the onset of this pain was two to three weeks prior. *Id.* at 1. He stated that the pain was severe enough to "wake him up [at] about 3 AM." *Id.* Petitioner underwent a full review of systems during this appointment. *Id.* at 2. Upon examination, Petitioner had limited extension in his neck. *Id.* However, his shoulders had no deformities or tenderness, and he exhibited a normal range of motion ("ROM"). *Id.*

Approximately nine months later, on September 12, 2015, Petitioner presented to his primary care physician ("PCP") Dr. Warren Ross, M.D. with complaints of left shoulder pain. *Id.* at 4. Dr. Ross noted that Petitioner reported "[o]nset: 2014." *Id.* He indicated that Petitioner stated that his pain was "constant[,]" and severe to the point that he "ha[d] lost ROM." *Id.* Upon examination, Dr. Ross did not find any deformities or tenderness, but Petitioner's ROM showed "[m]arked limitation . . . in all directions[.]" *Id.* Dr. Ross assessed Petitioner with "shoulder pain – new[.]" *Id.* Dr. Ross referred Petitioner to an orthopedist, recommended physical therapy, and planned to do an X-ray of the left shoulder. *Id.*

Petitioner presented to orthopedist Dr. Jason Stein, M.D. on September 28, 2015. Pet'r's Ex. 3 at 8, ECF No. 1-6. Petitioner reported that he "received a flu shot in October 2014[,] where he had a lot of pain in his shoulder afterwards." *Id.* He further reported that he "th[ought] that this all occurred around the same time that he had the flu shot." *Id.* Dr. Stein noted that Petitioner complained of "some loss of [ROM], but a very, very painful shoulder over the last almost year." *Id.* Dr. Stein noted difficulties in examining Petitioner's left shoulder including that Petitioner "f[ought him]" if he tried to raise Petitioner's arm over his head. *Id.* As a result, Dr. Stein could not determine Petitioner's cuff strength on the left side. *Id.* Dr. Stein noted the results of Petitioner's X-ray revealed "no fracture, no dislocation, no arthritis." *Id.* He assessed Petitioner with "[l]eft shoulder pain of unknown origin" and ordered an MRI to determine if his rotator cuff was torn. *Id.* He opined that "it is a low likelihood that it is [a tear] and most likely this is just adhesive capsulitis[4] or very bad rotator cuff tendonitis [sic] [.]"[5] *Id.*

---

[4] Adhesive capsulitis is "adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa, characterized by shoulder pain of gradual onset, with increasing pain, stiffness, and limitation of motion. Called also . . . frozen shoulder." *Dorland's Illustrated Medical Dictionary* 1263, 286 (32nd ed. 2012) [hereinafter "*Dorland's*"].

[5] Rotator cuff tendinitis is "an overuse injury consisting of inflammation of tendons of one or more of the muscles forming the rotator cuff, usually owing to repetitive elevation and abduction of the upper limb; it can lead to tendon degeneration and bony changes of the acromial head." *Dorland's* at 1881.

Petitioner underwent an MRI of his left shoulder on September 29, 2015. *Id.* at 14–15. The MRI revealed "no evidence to suggest a full-thickness rotator cuff tear." *Id.* at 15. However, there was a "partial tear/tendinosis within the distal supraspinatus tendon."[6] *Id.* The MRI also revealed a small amount of fluid within the subacromial subdeltoid bursa,[7] moderate acromioclavicular osteoarthritis,[8] a SLAP type III tear[9] involving the superior labrum, a tear of the anterior labrum, and a lipoma[10] within the deltoid muscle that was incompletely imaged. *Id.*

On October 12, 2015, Petitioner returned to orthopedist Dr. Stein. *Id.* at 20. Dr. Stein noted that Petitioner "still has a very similar exam with some loss of motion on exam." *Id.* He further noted that Petitioner's MRI revealed an "intact" rotator cuff. *Id.* During this visit, Petitioner reported that he was considering lawsuits for his shoulder pain caused by the flu vaccine. *Id.* Dr. Stein expressed that he did not wish to be involved with such litigation and recommended physical therapy. *Id.*

On November 12, 2015, Petitioner reported to a new orthopedist, Dr. Jon Koman, M.D. for his left-sided shoulder pain. Pet'r's Ex. 1 at 8, ECF No. 1-4. Petitioner stated that his shoulder was injured from the flu shot and that the injury has persisted for the last thirteen months, since October 12, 2014.[11] *Id.* Petitioner also reported that his previous diagnosis was "frozen shoulder." *Id.* Dr. Koman assessed Petitioner with an incomplete rotator cuff tear or rupture of the left shoulder, benign lipomatous neoplasm of skin and subcutaneous tissue of left arm, and adhesive capsulitis of left shoulder. *Id.* at 10. Dr. Koman prescribed physical therapy and a Medrol Dose Pak.[12] *Id.*

---

[6] The distal supraspinatus tendon originates in the "supraspinous fossa of [the] scapula; insertion[:] greater tubercle of [the] humerus; innervation[:] suprascapular; action[:] abducts humerus." *Dorland's* at 1201.

[7] The subacromial subdeltoid bursa is "a bursa located between the acromion and the insertion of the supraspinatus muscle, extending between the deltoid and the greater tubercle of the humerus; usually continuous with the subdeltoid bursa; a bursa between the deltoid and the glenohumeral (shoulder) joint capsule . . . ." *Dorland's* at 263. A bursa is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." *Dorland's* at 262.

[8] Acromioclavicular osteoarthritis is inflammation in the acromioclavicular joint. *Dorland's* at 150. The acromioclavicular joint is "the synovial joint between the acromion of the scapula and the acromial extremity of the clavicle[.]" *Dorland's* at 971.

[9] A SLAP type III tear is also known as a bucket-handle fracture. "SLAP" type tear is defined as a tear of the superior labrum from anterior to posterior. It is "a tear in the semilunar cartilage, along the middle portion, leaving a loop of cartilage lying in the intercondylar notch." *Dorland's* at 740.

[10] A lipoma is "a benign, soft, rubbery, encapsulated tumor of adipose tissue, usually composed of mature fat cells; it generally occurs as a solitary lesion in the subcutaneous tissue of the trunk[.]" *Dorland's* at 1063.

[11] This date pre-dates Petitioner's flu vaccine on October 17, 2014. During his testimony, Petitioner clarified that he was not referencing a calendar or his vaccination record when reporting the onset of his shoulder pain at this appointment, but rather was reporting the date from memory. Tr. 31:13–19. Petitioner testified that he was merely "giving an approximate date of vaccination[]" because he could not "recall exactly what day it was because it just d[idn't] register[.]" Tr. 31:1–7.

[12] A Medrol Dose Pak is a prescription of Medrol. Medrol is the "trademark for preparation of methylprednisolone." *Dorland's* at 1120. Methylprednisolone is "a synthetic glucocorticoid [steroid] derived from progesterone, used in replacement therapy for adrenocortical insufficiency and as an anti[-]inflammatory and immunosuppressant in a wide variety of disorders[.]" *Dorland's* at 1154.

On November 19, 2015, Petitioner reported for physical therapy. Pet'r's Ex. 4 at 6, ECF No. 1-7. On Petitioner's intake forms, he listed his date of injury as October 14, 2014.[13] *Id.* Petitioner also reported that he received a flu shot that gave him left shoulder pain, which caused "extreme pain at times[,]" and limited ROM. *Id.*

Petitioner had a follow-up with orthopedist Dr. Koman on January 7, 2016. Pet'r's Ex. 1 at 5. Dr. Koman noted that Petitioner had received oral steroids and attended physical therapy since his prior visit in November 2015. *Id.* During this visit, Petitioner reported improvement of his shoulder symptoms and noted an increased ROM through physical therapy. *Id.* Petitioner also reported that he was sleeping better at night, "but still wakes with throbbing pain occasionally. The sharp pain . . . has dissipated." *Id.* Upon examination, Dr. Koman noted that Petitioner's acromioclavicular joint was non-tender, his forward flexion was 150 degrees, abduction was 90 degrees, and his external rotation was 45 degrees. *Id.* Dr. Koman recommended continued physical therapy. *Id.* Petitioner attended additional physical therapy sessions until February 22, 2016, when he was discharged and advised to continue at-home exercises. Pet'r's Ex. 4 at 3.

Petitioner returned to Dr. Koman on March 2, 2016. Pet'r's Ex. 1 at 2. Petitioner reported that he was still doing his at-home physical therapy exercises and experienced pain relief with heat, "such as after taking a hot shower." *Id.* Upon examination, Petitioner had "essentially full [ROM] with pain at extremes." *Id.* Dr. Koman noted that Petitioner's left-sided strength was limited by some pain. *Id.* Dr. Koman maintained his assessment of adhesive capsulitis and an incomplete rotator cuff tear or rupture of left shoulder, that was "not specified as traumatic[.]" *Id.* at 3. Dr. Koman recommended that Petitioner continue his at-home exercises. *Id.* Petitioner has not filed any additional medical records.

#### b.  Affidavits and Testimony

##### i.  Petitioner – Mr. Samuel Hutchens

Petitioner has filed four affidavits in support of his claim and testified at the fact hearing. Pet'r's Exs. 5, 7, 15, 17, ECF Nos. 1-8, 10-1, 25-2, 33-3; Tr. 7–51. In his first affidavit, Petitioner attested that he "felt pain at the vaccination site immediately following vaccination." Pet'r's Ex. 5 at 1; *see also* Pet'r's Ex. 7 at 1. In his second affidavit, Petitioner clarified that the pain he felt following the injection was in his left shoulder. Pet'r's Ex. 7 at 1. Petitioner attested that he experienced "left shoulder pain and reduced [ROM] for more than six [] months[.]" *Id.* Petitioner's first two affidavits were essentially identical and contained limited, general information. *See* Pet'r's Exs. 5, 7.

In his third affidavit, Petitioner provided a more detailed account of his receipt of the flu vaccine. Pet'r's Ex. 15 at 1. Petitioner wrote that he received the flu vaccine in his left shoulder at his place of employment, CB Flooring, on October 17, 2014. *Id.* Petitioner attested that "[a]s the injection was administered, [he] felt a sharp pain immediately and commented to others waiting, '[w]atch out! This hurts!'" *Id.*; *see also* Tr. 11:18. During his testimony, Petitioner explained that by making this statement, he was trying to "mess with" the others waiting in line to receive their vaccines by telling them "it was extremely painful, . . . [and to] be careful[.]" Tr. 14:18–19. He

---

[13] This date also pre-dates Petitioner's October 17, 2014 flu vaccine. *See supra* note 11.

testified that he was "just kidding with them" and while he did experience pain, "it wasn't the kind [of pain] that [he] would say, 'don't get your shot' . . . [it was] just a shot." Tr. 14:23–25. Petitioner wrote that he "remember[ed] the pain because [he] had not had pain like that with any previous injections." Pet'r's Ex. 15 at 1; *see also* Tr. 11:10–12. Petitioner attested that "[i]t [wa]s [his] belief that the nurse inadvertently placed the injection too high[]" during his receipt of the flu vaccine in question. Pet'r's Ex. 15 at 1. He noted that the nurse administering his flu shot was standing and he was seated in a chair. *Id.*

Petitioner wrote that, immediately following the vaccine on October 17, 2014, he mentioned to several of his co-workers, including Tammy Gomes, Beth Smith, and Linda Bode, that he experienced pain following the injection. *Id.* During his testimony, Petitioner was asked to whom he first spoke following receipt of his flu vaccine. Tr. 13:22–23. Petitioner testified that he spoke to Ms. Bode "immediately following [his] vaccination[] . . . [i]n the reception area[]" of their office. Tr. 13:22–25, 14:1. Petitioner wrote that he commented to Ms. Bode that "this was the first time [he had] ever experienced any pain from a flu shot." Pet'r's Ex. 15 at 1. Petitioner could not recall telling Ms. Bode anything more specific about his pain "beyond the fact that it hurt[.]" Tr. 14:6–7. He "just recall[ed] talking to [Ms. Bode] about [the shot] that it hurt and that's pretty much it." Tr. 14:8–9. He explained that the pain at the time "didn't increase and get worse . . . [it] was just a little bit of pain . . . [that he] had never felt." Tr. 16:25, 17:2–4. Petitioner attested that he showed Ms. Bode "the injection area of [his] arm[,] which was [at that time] red, swollen, and throbbing slightly." Pet'r's Ex. 15 at 1.

Petitioner later testified that he saw Ms. Gomes "in line on the way out . . . [a]nd she's the first one that [he] told that [the shot] was extremely painful[.]" Tr. 15:10–17; *see also* Tr. 15:18– 20. Petitioner stated that he then saw Ms. Smith in line, but he could not recall if he spoke to her directly regarding his pain at that time. Tr. 15:21–25, 16:1–2. He noted that he did speak to Ms. Smith "at some point following [his] vaccination" because "she g[ave him] a lot of the work [] that [he] ha[d] to do." Tr. 16:3–6. He testified that he told Ms. Smith "that [the shot] hurt where [he had] never had any pain before." Tr. 16:7–10. He stated that he "th[ought Ms. Smith] said hers hurt a little . . . just the normal [pain] . . . for a day or two, like that." Tr. 16:10–12. Petitioner did not specify when this conversation with Ms. Smith occurred. *See, e.g.,* Tr. 16:1–12.

Petitioner further described his workday on October 17, 2014. He testified that he received work orders from Ms. Bode in the morning before his shot. Tr. 16:14–16. Petitioner stated that following his shot, he had a discussion with Ms. Bode in the reception area. Tr. 15:18–20, 16:13– 19. He testified that he then "went and did [the work orders] and came back and got additional work[]" from Ms. Bode. Tr. 16:17–19. Petitioner stated that he could still perform his work duties throughout the rest of the day on October 17, 2014. Tr. 17:9–13. Petitioner explained that his left shoulder "felt fine" while performing his work duties that day, "other than just a tiny bit of [] throbbing[.]" Tr. 16:20–24.

Petitioner posited that following the vaccine, his pain persisted for "weeks [that] turned into months." Pet'r's Ex. 15 at 2. He explained that "[i]nstead of healing, the pain slowly increased to the point where it limited the movement in [his] arm and shoulder." *Id.* As a result, he noted that "[s]imple tasks" like reaching above shoulder height or "moving [his] arm to tuck in [his] shirt became unbearable." *Id.* Petitioner testified that his inability to put on a belt began "about a month,

two months[]" post vaccination. Tr. 21:10–12. He explained that at that time, he began needing to ask his wife for help "on just about everything." Tr. 21:20–25, 22:1.

Petitioner attested that "[f]our months after the shot, [his] pain increased and the throbbing was more pronounced at night[,] which prevented [him] from a full night's sleep." Pet'r's Ex. 15 at 2. On cross-examination, Petitioner testified that his pain increased around "April and May[,]" although he was not confident regarding the exact month. Tr. 43:1–3. Petitioner continued that, approximately four months following his flu vaccine, his ROM was "seriously decreasing" and "[a]ny sudden reach on impulse would cause excruciating pain throughout [his] arm and shoulder[.]" Pet'r's Ex. 15 at 2. Petitioner described his pain as "ranking at a 10." *Id.* Petitioner elaborated on this pain on impulse and described an instance when he "had to reach out real fast [because] something was falling[.]" Tr. 22:16–17. He testified that he "reached out real fast to grab it and the pain was excruciating[,]" going from a six to a twelve on his subjective pain scale. Tr. 22:17–20. Petitioner later testified that he thought his pain reached that threshold following this instance which occurred "[p]robably [eleven] or [twelve] months []" following receipt of the vaccine, but he was not "100 percent sure[.]" Tr. 22:22–25. He attested that "[w]hen [he] was no longer able to reach behind [his] back or raise [his] arm away from [his] side and the pain was debilitating, [he] knew it was time to see [his] doctor." Pet'r's Ex. 15 at 2.

Petitioner described the treatment he sought in connection with his left-sided shoulder pain. *Id.* Petitioner wrote that he had an appointment with his PCP's assistant, Mr. Josh Anderson, on December 8, 2014. *Id.* He noted that his PCP, Dr. Ross, was not available on this date. *Id.* Petitioner stated that he was "upset" that he had to see Mr. Anderson instead of his regular doctor. Tr. 44:7. Petitioner testified that he complained of left shoulder pain during this appointment. Tr. 24:1–4. Petitioner stated that he reported that his pain was "still there since getting the shot and it's getting . . . worse[.]" Tr. 24:8–10. Petitioner could not recall if he mentioned any other symptoms related to his left shoulder to Mr. Anderson during this visit. Tr. 24:22–25. However, Petitioner acknowledged that his records from this appointment do not reflect that he complained of any difficulties involving his left shoulder and that in fact, he "was there for something else[.]" Tr. 23:23–25, 24:6–7.

Petitioner attested that during this visit, Mr. Anderson "applied pressure around the injection area and [Petitioner's] shoulder area. Pet'r's Ex. 15 at 2. Petitioner could not recall if Mr. Anderson examined his ROM during this appointment. Tr. 25:6–18. However, he did recall that he had a normal ROM and could lift his left arm at that time. Tr. 41:16–20. Petitioner noted that he was taking ibuprofen for his left-sided shoulder pain around the time of this appointment. Pet'r's Ex. 17 at 1. He explained that this time period was "not when [the pain] was excruciating[.]" Tr. 24:7. Petitioner characterized his left shoulder pain at this time at "probably a three[]" and "just throbbing." Tr. 47:18, 42:24. Petitioner could not recall any treatment plan prescribed by Mr. Anderson in relation to his left shoulder pain after this appointment, as he "wasn't there because of the shoulder." Tr. 26:18–22. Petitioner opined that Mr. Anderson "is a believer of the notion that one cannot get hurt from a flu shot." Pet'r's Ex. 15 at 2. Petitioner stated that "when [Mr. Anderson] said [that], then [he] just wasn't impressed with [Mr. Anderson]." Tr. 44:9–10. Petitioner testified that he thought Mr. Anderson "was [a] pretty cold, young doctor." Tr. 44:11.

In his fourth affidavit, Petitioner addressed his gap in treatment between December 8, 2014, and September 12, 2015. Pet'r's Ex. 17 at 1. Petitioner explained that he did not seek treatment after December 8, 2014, until September 12, 2015, because "[he] was using [] DMSO, which was providing some relief." *Id.* at 2. Petitioner testified that "the pain wasn't severe[]" during that time period to warrant visiting his doctor. Tr. 28:11–16. Petitioner noted that as his pain continued to increase throughout 2015, he began applying DMSO during the workday because his pain was limiting his physical job capabilities. *See* Pet'r's Ex. 15 at 2; *see also* Pet'r's Ex. 17 at 1. Petitioner attested that the DMSO provided some relief but became less effective as his pain continued to increase. *See id.* He wrote that he sought treatment again in September 2015, because "the DMSO was not enough[,] and the pain became debilitating." Pet'r's Ex. 17 at 2. Petitioner admitted that he did not seek treatment for his left-sided shoulder pain until September 12, 2015. Tr. 43:15–19.

Petitioner further addressed his use of the topical pain reliever, DMSO. Petitioner wrote that in February 2015, he "developed a nightly ritual of applying DMSO to help the pain subside enough to allow [him] to sleep." Pet'r's Ex. 15 at 1. Petitioner noted that he purchased DMSO for the first time to help manage his pain in February 2015. Pet'r's Ex. 17 at 1. During his testimony, he stated that he began using DMSO "six, eight, [or] ten months[]" following his receipt of the vaccine. Tr. 19:3–6. Petitioner wrote that he purchased DMSO in April and July of 2015 "due to ibuprofen not giving enough relief." Pet'r's Ex. 17 at 1. He wrote that he "did not even consider at the time to save a receipt." *Id.* However, he did provide a receipt for his DMSO purchase in July 2015. *Id.*; *see also* Pet'r's Ex. 16.

During his testimony, Petitioner described the examination that Dr. Ross performed during his September 12, 2015 visit. Tr. 32:4–16. Petitioner stated that Dr. Ross "ask[ed him] to raise [his] arm . . . [Dr. Ross would] lift up on it and it would be in a lot of pain." Tr. 32:10–12. Petitioner indicated that he could not raise his own arm by himself but "could help lift it up with [his] right arm[.]" Tr. 32:12–14. Petitioner testified that Dr. Ross diagnosed him with frozen shoulder during this appointment. Tr. 32:15–16. He testified that it was after his diagnosis of frozen shoulder that he learned he may have a legal claim regarding his alleged vaccine-related injury. Tr. 42:10–18. He indicated that his left-sided shoulder pain had resolved around May 2016, following treatment with physical therapy. Tr. 38:15–18.

Petitioner highlighted the differences between the examinations performed by Mr. Anderson on December 8, 2014, and Dr. Ross on September 12, 2015. Tr. 32:17–25, 33:1. Petitioner testified that "Dr. Ross tried to get [him] to do all different motions . . . where the only thing [he] remember[ed] with [Mr.] Anderson [wa]s putting pressure on the arm[.]" Tr. 32:20–23. Petitioner could not recall if Mr. Anderson "had [him] lift [his] arm up or move it to the side[.]" Tr. 41:9–12. Petitioner also described and compared the examination performed by Dr. Stein on September 28, 2015. Tr. 33:11–14. Petitioner stated that like Dr. Ross, Dr. Stein "was trying to get [him] to go through all different motions to see . . . where [he] could move it, [and] how much motion [he] could get from it[.]" Tr. 33:13–15. Petitioner opined that this examination was "more extensive" than the examination performed by Mr. Anderson on December 8, 2014. Tr. 33:23–25, 34:1–5.

Petitioner testified regarding the nature of his employment at CB Flooring. Tr. 8:5–12. He explained that he "d[id] a little bit of everything in the building, maintenance, repairs, set up

9

computers . . . mov[ed] furniture, [and] set[] up offices." Tr. 8:6–12. Petitioner testified that he had never sustained an injury to his left arm working in this capacity. Tr. 9:7–9. He stated that he had not "injure[d his] left shoulder at any point during this time period separate and apart from [his] vaccine[.]" Tr. 28:20–23. He noted that around "six, eight, [or] ten months[]" following his October 17, 2014 flu vaccine, he began expressing to Ms. Bode that he was having difficulties performing his usual work duties. Tr. 18:14–19. In response, Petitioner received additional help on certain tasks which he used to perform alone, such as moving office furniture. Tr. 20:1–17. Petitioner testified that he continued with his work assignments as best as he could because he "didn't want to go in and say, 'well, I can't do this[,]' because [he could] very easily be replaced . . . [and a]t this age, you don't go get another job[.]" Tr. 22:1–4.

Petitioner described his then-current condition and stated that he "probably ha[d] better than 80 percent [ROM]." Tr. 36:19–20. He attributed his improved condition to physical therapy. Tr. 36:15–16. He stated that "[a]s far as [he was] concerned, [his] left shoulder is fine now again[]" and he was "satisfied with 80 percent [mobility]." Tr. 38:24–25.

### ii.  Ms. Beth Smith

Ms. Beth Smith submitted two affidavits in support of Petitioner's claim and testified at the fact hearing. Pet'r's Exs. 10, 14, ECF Nos. 18-4, 24-3; Tr. 51–72. Ms. Smith attested that she has worked with Petitioner for the past twenty years. Pet'r's Ex. 10 at 1. Ms. Smith wrote that "[b]efore receiving the flu vaccine on October 17, 2014, [Petitioner] never complained of left arm or shoulder pain, or any difficulty using his left arm or shoulder." *Id.* She indicated that she "never observed Petitioner in left arm or shoulder pain or have any difficulty using his left arm or shoulder." *Id.*

Ms. Smith wrote that she saw Petitioner immediately before and after his receipt of the flu vaccine on October 17, 2014. *Id.* She attested that "[a]fter [Petitioner] received the flu shot, he said it hurt and [he] was rubbing his left upper arm." *Id.*; *see also* Tr. 57:18–19, 58:1–5. She specified that Petitioner did not state that he experienced pain directly to her, but to a group of people waiting to receive their shots. Tr. 57:20–22. She noted that she "thought [Petitioner] was teasing and playing a prank on the person who went [after] him because they are afraid of needles." Pet'r's Ex. 10 at 1. When asked why she thought that, Ms. Smith explained that Petitioner "makes jokes often[]" and "[t]here were a lot of people nervous about needles in line, and . . . he just made the general statement and was rubbing his arm. So [she] didn't think anything of it." Tr. 58:6–13.

Ms. Smith explained that she remembered the date that Petitioner received his flu vaccine because it was a "company[-]wide flu shot day" and they "were in line for the flu shot together that day." Pet'r's Ex. 10 at 1. Ms. Smith testified that she and Petitioner were "within speaking distance[]" while in line for the flu shot. Tr. 56:9. She further corroborated the exact date of their flu vaccine October 17, 2014. Pet'r's Ex. 14 at 1. Ms. Smith wrote that she "remember[ed] the time frame because it was [her] daughter's senior year at high school and October was a very busy month." *Id.* She recalled that they received the vaccine "on a Friday (October 17, 2014), and [her] daughter's homecoming was that weekend." *Id.* She continued that "when [Petitioner] told [her] the shot hurt, [she] was hoping he was joking because [she] would not be able to prepare a group

of teenage girls and do their hair on Saturday if the shot was going to cause stiffness in [her] arm."
*Id.*

Ms. Smith wrote that she "saw [Petitioner] a couple days later [following receipt of the flu vaccine on October 17, 2014] and he told [her] that his left arm still hurt." *Id.* She attested that Petitioner showed her his left upper arm and shoulder. *Id.* Ms. Smith described Petitioner's shoulder and wrote that "it was swollen and red around the edges of where he received the shot." *Id.* Ms. Smith testified that Petitioner "had a t-shirt on, . . . and [she] could see where it was swollen and red . . . on his upper left arm, closer to the shoulder more so than the elbow." Tr. 62:1–6. She wrote that "[a]fter the weekend and through the following week, [Petitioner] continued to comment about his arm being tender." Pet'r's Ex. 14 at 1.

Ms. Smith noted that Petitioner still complained of his pain for "[w]eeks after the shot[.]" Pet'r's Ex. 10 at 1. She explained that Petitioner "does a lot of things around the building[,] . . . and he couldn't do certain tasks because he couldn't move his arm." *Id.* at 1–2. Ms. Smith testified that "[f]ollowing [Petitioner's] vaccination, there were times when he could not move some of the heavy furniture that he normally could move by himself." Tr. 54:4–6. She indicated that "[e]ventually, he was unable to do his work tasks[]" altogether without assistance. Pet'r's Ex. 10 at 2. Ms. Smith testified that she knew Petitioner was experiencing pain because he not only told her, but "he asked for help with certain things, [and] his arm did not move as freely as his right arm." Tr. 54:10–15. She stated it was not like Petitioner to ask for assistance with tasks. Tr. 65:9–11. Ms. Smith estimated that Petitioner could no longer move one arm without the other "well past flu season . . . sometime in the summer." Tr. 64:2–3. She based this opinion, in part, on the fact that she observed Petitioner "start[ing] to become limited in what he was able to do . . . [in] spring or summer." Tr. 67:13–16.

She clarified that "immediately" following the flu vaccine, Petitioner did not tell her that he was having trouble lifting his arm. Tr. 62:16. Rather, as he began struggling with tasks, Petitioner would show Ms. Smith how high he could lift his arm and she observed that "[i]t gradually became worse over time." Tr. 62:21. Ms. Smith could not recall how high Petitioner could lift his arm. Tr. 63:16–19.

### iii.  Ms. Tammy Gomes

Ms. Tammy Gomes submitted two affidavits in support of Petitioner's claim. Pet'r's Exs. 9, 12, ECF Nos. 18-3, 23-2. Ms. Gomes attested that she has been Petitioner's co-worker at CB Flooring for more than fifteen years. Pet'r's Ex. 9 at 1. Ms. Gomes wrote that prior to his October 17, 2014 flu vaccine, Petitioner "never complained of left arm or shoulder pain, or any difficulty using his left arm or shoulder." *Id.* She indicated that she also "never observed [Petitioner] in left arm or shoulder pain or have any difficulty using his left arm or shoulder." *Id.*

Ms. Gomes attested that "[s]ometime the same day as the vaccination[]" on October 17, 2014, she recalled Petitioner telling her that "his flu shot didn't feel the same as vaccines he had before." Pet'r's Ex. 12 at 1. She wrote that "[h]e complained of pain in his left upper shoulder and arm[ and] . . . thought his pain was more severe than normal[.]" Pet'r's Ex. 9 at 1. Ms. Gomes

noted that "[Petitioner] asked [her] how [her] arm felt and [she] expressed that [she] had the normal soreness[.]" *Id.*; *see also* Pet'r's Ex. 12 at 1.

She wrote that she specifically remembers the date that Petitioner received the flu vaccine because she received a flu shot on the same day at their shared place of employment. *See id.* Ms. Gomes attested that an email was sent on the day of the flu vaccine, which "confirmed [her] recollection of seeing [Petitioner] in line for the shot and [their] conversation afterwards." *See* Pet'r's Ex. 12 at 1; *see also* Pet'r's Ex. 11, ECF No. 22-2.

Ms. Gomes attested that since Petitioner's flu vaccine, he has "continued to complain of left arm and shoulder pain." Pet'r's Ex. 9 at 1. She wrote that "[a]bout two months later, [Petitioner] told [her] he could barely put his belt on because he could not reach his left arm around his waist . . . because of the pain in his left shoulder." *Id.* Ms. Gomes noted that Petitioner showed her his limited ROM in relation to his belt, "and he couldn't move his arm around his back." *Id.* Ms. Gomes wrote that Petitioner told her that "he had difficulty taking a shower and using [his left] arm to shower." *Id.* She attested that Petitioner "eventually" went to the doctor for his left-sided shoulder pain. *Id.*

### iv.   Ms. Linda Bode

Ms. Linda Bode submitted one affidavit in support of Petitioner's claim. Pet'r's Ex. 8, ECF No. 18-2. Ms. Bode attested that she is now retired but worked with Petitioner for ten years. *Id.* at 1. Ms. Bode wrote that "[b]efore receiving the flu vaccine on October 17, 2014, [Petitioner] never complained of left arm or shoulder pain, or any difficulty using his left arm or shoulder." *Id.* She indicated that she "never observed Petitioner in left arm or shoulder pain or have any difficulty using his left arm or shoulder." *Id.*

Ms. Bode attested that it was part of her daily job duties as the receptionist to sit down with Petitioner each day to give him his job instructions. *Id.* She wrote that on October 17, 2014, she spoke with Petitioner immediately following his receipt of the flu vaccine as part of their daily discussion. *Id.* Ms. Bode noted that "[she] could see that he was in pain, . . . [and h]e told [her] that he 'got this flu shot and [his] arm his killing [him].'" *Id.* She wrote that "[Petitioner] thought it was from the shot, like normal vaccination pain from the needle." *Id.* Ms. Bode noted that she agreed with Petitioner. *Id.*

Ms. Bode wrote that Petitioner's "left shoulder pain started the day he was vaccinated and escalated from there." *Id.* at 2. She explained that Petitioner's pain continued to increase "[o]ver the following days, weeks, and months[.]" *Id.* She attested that she "had to listen to him everyday [sic] talk about his left upper arm and shoulder pain, so [she] was very aware of his problem." *Id.* She corroborated that in the days, weeks, and months that followed the vaccine, Petitioner was in pain because she "would see him wince when he tried to move his left arm, and that he could not move his left arm." *Id.* Ms. Bode attested that "[w]hen his left arm and shoulder pain did not resolve after a few weeks or so," she told him he should see a doctor. *Id.* However, she explained that Petitioner was "stubborn," and "pretty hard[-]headed about going to the doctor . . . ." *Id.* She wrote that, as a result, she "couldn't get him to go to the doctor[]" until "[he] realized it wasn't going to get better[.]" *Id.*

12

### III.     Applicable Law

To receive compensation under the Vaccine Act, Petitioner must demonstrate either that: (1) he suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as amended by 42 C.F.R. § 100.3; or (2) that he suffered an "off-Table injury," one not listed on the Table as a result of his receipt of a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006).

In order for Petitioner to succeed on a Table SIRVA claim, he must show that his claim meets the Table criteria for a SIRVA. The Vaccine Injury Table considers a SIRVA a presumptive injury for the flu vaccine if the first symptom or manifestation of onset of the illness occurs within forty-eight hours of an intramuscular vaccine administration. *See* 42 C.F.R. § 100.3(a)(XIV). The Qualifications and Aids to Interpretation ("QAI") further specify:

A vaccine recipient shall be considered to have suffered a SIRVA if such recipient manifests all of the following:

i)     No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

ii)    Pain occurs within the specified time-frame;

iii)   Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

iv)    No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10). Before Petitioner can proceed with his Table SIRVA claim, I must first make a determination regarding the onset of Petitioner's left-sided shoulder pain. If, after my determination, Petitioner is unable to succeed on a Table claim, Petitioner may, alternatively, prove that his injury was caused-in-fact by a Table vaccine. In order to succeed on a theory of causation-in-fact, Petitioner would have to show:

by preponderant evidence that the vaccination brought about [the] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

As a threshold consideration, the Vaccine Act provides that "[t]he special master or court may not make such a finding [of entitlement] based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa–13(a)(1). In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 933 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Id.* However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition.). While a special master must consider these opinions and records, they are not "binding on the special master or court." 42 U.S.C. § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

Judges of the Court of Federal Claims have reaffirmed the finding in *Cucuras* that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. *See*, *e.g.*, *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd sub nom. Rickett v. Sec'y of Health & Hum. Servs.*, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); *Doe/17 v. Sec'y of Health & Hum. Servs.*, 84 Fed. Cl. 691, 711 (2008); *Ryman v. Sec'y of Health & Hum. Servs.*, 65 Fed. Cl. 35, 41-42 (2005); *Snyder v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 461, 465 (1996) (stating "[t]he special master apparently reasoned that, if Petitioner suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Petitioner during his life to date. Finding Petitioner's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), *aff'd*, 117 F.3d 545, 547–48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete. To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

When weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony. *Cucuras*, 993 F.2d at 1528. Testimony offered after the events in question is less reliable than contemporaneous reports  made when the motivation for accurate explication of symptoms is more immediate. *Reusser v. Sec'y of Health & Hum. Servs.*, 28 Fed. Cl. 516, 523 (1993). However, compelling oral testimony may be more persuasive than written records. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); *Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992).

## IV.   Discussion

### a.  Date of Injury Onset

#### i.  Petitioner's December 8, 2014 Appointment

Petitioner has not disputed the accuracy of his medical records. Still, Petitioner maintained that he complained of left shoulder pain, which he experienced following his October 17, 2014 flu vaccine, during his December 8, 2014 appointment with Mr. Anderson, despite it not being recorded. Tr. 24:1–4. Petitioner admitted that he presented to Mr. Anderson on December 8, 2014, approximately two months post vaccination for "something else," Tr. 23:23–25, 24:6–7, namely neck and chest pain. *See* Pet'r's Ex. 2 at 2. He also attributed his issues sleeping during this time to said left-sided neck and chest pain. *Id.* Medical records notwithstanding, Petitioner maintained that he was experiencing left shoulder pain since his vaccine and during this appointment and complained to Mr. Anderson about it. *See* Tr. 24:1–4. The only evidence that he discussed this pain with a medical professional on December 8, 2014, are the sole claims of Petitioner himself. Such evidence of pain that Petitioner experienced during this time period cannot be determinative. *See* 42 U.S.C. § 300aa–13(a)(1) ("[t]he special master or court may not make such a finding [of entitlement] based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.").

Indeed, Petitioner's account of his December 8, 2014 appointment with Mr. Anderson and overall status at that time is inconsistent with his medical records and affidavits. In his written affidavit and later testimony, Petitioner indicated that one- to- two months post vaccination, his ROM had seriously decreased to the point that he could no longer get dressed without difficulty. *See* Pet'r's Ex. 15 at 2; *see also* Tr. 21:10–12. Specifically, his affidavits indicate that he experienced pain and struggled with reaching behind his back to tuck in his shirt or put on a belt beginning one- to- two months post vaccination. *See* Pet'r's Ex. 15 at 2; Pet'r's Ex. 9 at 1; Tr. 21:10–12. In fact, Petitioner testified that he had to ask his wife for assistance on "just about everything[,]" beginning one- to- two- months post vaccination. Tr. 21:20–25, 22:1. One or two months after Petitioner's October 17, 2014 flu vaccine would be around the time of his December 8, 2014 appointment.

Yet, Petitioner later backtracked and explained that December 2014 was "not when [the pain] was excruciating[.]" Tr. 24:7. Instead, he characterized his left shoulder pain during that time at "probably a three[]" and "just throbbing." Tr. 47:18, 42:24. He conceded that at the time of his December 8, 2014 appointment with Mr. Anderson, he had a normal ROM. Tr. 41:16–21. Indeed, the medical records from this visit confirm that upon examination, Petitioner had a normal ROM and "no deformities . . . [and] no tenderness[]" in his left shoulder. Pet'r's Ex. 2 at 2. Petitioner's medical records from his December 8, 2014 appointment do not support his assertion that he was experiencing or complained of left shoulder pain during this visit, or since his receipt of the flu vaccine in October 2014. In light of contemporaneous medical records that record an examination illustrating no injury in his left shoulder, coupled with Petitioner's contradictory accounts of his shoulder pain in December, Petitioner's testimony regarding his December 8, 2014 appointment and condition at that time are not persuasive evidence in support of his claim. *See, e.g.*, *Doe/70 v. Sec'y of Health & Hum. Servs.,* 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (finding that "the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date."); *see also Cucuras,* 993 F.2d at 1528 (holding that "when weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony.").

Petitioner testified about why he believed Mr. Anderson did not record his complaints of left shoulder pain associated with the flu vaccine on December 8, 2014. Petitioner stated that he "wasn't impressed" with Mr. Anderson and was bothered by his assertion that a patient "can't get hurt with a flu shot[.]" Tr. 44:9–10. Petitioner expressed that he found Mr. Anderson to be a "pretty cold, young doctor." Tr. 44:11. As a result, Petitioner suggests that Mr. Anderson's opinion regarding vaccine-related injuries accounts for his failure to document Petitioner's concerns that the flu shot caused his left shoulder pain. I will not assume, based on a petitioner's speculation about a medical professional's personal beliefs, that said medical professional would intentionally omit a patient's medical complaints from the record. Indeed, Mr. Anderson's notes regarding Petitioner's neck and chest complaints appear detailed and complete. I do not find Petitioner's implications alone to be persuasive. Rather, I find it is more likely than not that Petitioner's records do not mention his complaints regarding his left shoulder pain during this visit because he admittedly "was there for something else," and he attributed his most severe pain at nighttime to the other injury. Tr. 23:23–25, 24:6–7; *see also Kirby,* 997 F.3d at 1383 (determining that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition.).

### ii.   Gap in Treatment Between December 2014 and September 2015

#### 1.   Evidence regarding pain during time period

Petitioner's medical records are silent regarding his pain from December 2014 to September 2015. In fact, Petitioner's medical records do not mention *any* report of left shoulder pain at the time of injection or thereafter until approximately eleven months following his October 17, 2014 flu vaccine. This fact is corroborated by the visit notes for Petitioner's September 12, 2015 appointment with Dr. Ross, which indicate that Petitioner was assessed with "[s]houlder pain – new[.]" Pet'r's Ex. 2 at 4. Petitioner conceded this fact and acknowledged that he did not explicitly seek treatment for his left shoulder pain until September 12, 2015, when the pain became excruciating and no other home remedies, such as DMSO or ibuprofen were effective at alleviating his pain. *See*, *e.g.*, Pet'r's Ex. 17 at 1–2. Still, Petitioner did not attribute his left shoulder pain to his flu vaccine during this appointment. Pet'r's Ex. 2 at 4. According to his medical records, Petitioner did not complain of shoulder pain associated with his October 2014 flu vaccine to a medical provider until his September 28, 2015 appointment with Dr. Stein. Pet'r's Ex. 3 at 8. Although the record from Petitioner's September 28, 2015 encounter, in which he attributed his left shoulder pain to the flu vaccine for the first time, was made eleven months post vaccination, it is nonetheless trustworthy as a medical record contemporaneous to his treatment, as it was created to facilitate diagnosis and care for his left shoulder pain. *See*, *e.g.*, *Cooper v. Sec'y of Health & Hum. Servs.*, No. 16-1378V, 2018 WL 1835179, at *6 (Fed. Cl. Spec. Mstr. Jan. 18, 2018). Further, Petitioner's later treatment records associate onset of his pain to his vaccination.[14] *Lang v. Sec'y of Health & Hum. Servs.*, No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020).

Indeed, postponing treatment for a limited number of months is not *per se* dispositive of whether onset of shoulder pain occurred within the specified time period required for SIRVA. *See*, *e.g.*, *Lang*, 2020 WL 7873272, at *10 (citing *Forman-Franco v. Sec'y of Health & Hum. Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018); *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied* 142 Fed. Cl. 329 (2019); *Gurney v. Sec'y of Health & Hum. Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Spec. Mstr. Mar. 19, 2019)). In fact, it is not at all unusual for people not to seek immediate medical care for an injury consistent with SIRVA. *See*, *e.g.*, *Hanna v. Sec'y of Health & Hum. Servs.*, No. 18-1455V, 2021 WL 3486248 (Fed. Cl. Spec. Mstr. July 15, 2021) (citing *Lang*, 2020 WL 7873272, at *10 (noting that "[R]espondent's expert has conceded that there is no such thing as an 'appropriate' time to seek treatment" for SIRVA); *Smallwood v. Sec'y of Health & Hum. Servs.*, No. 18-291V, 2020 WL 2954958, at *10 (Fed. Cl. Spec. Mstr. Apr. 29, 2020) (finding that it is "common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own.")). Therefore, the gap in treatment in Petitioner's medical records does not negate his claim that he experienced left shoulder pain on the day of his flu vaccination.

The affidavits submitted on Petitioner's behalf indicate that Petitioner complained of left shoulder pain. These affidavits stop short of providing any timeframe. However, Ms. Bode's

---

[14] Petitioner also reported onset of pain occurring in October 2014 during his orthopedic and physical therapy evaluations in November 2015, thirteen months post-vaccination. Pet'r's Ex. 1 at 8; Pet'r's Ex. 4 at 6.

affidavit describes that Petitioner's "left shoulder pain started the day he was vaccinated and escalated from there[]" for days, weeks, and months following vaccination. Pet'r's Ex. 8 at 2. Indeed, Petitioner stated, and his witnesses agree, that Petitioner complained of pain in the "days, weeks, and months" following receipt of his flu vaccine. *See, e.g.*, Pet'r's Ex. 8 at 2; Pet'r's Ex. 15 at 2. Referring to the "days, weeks, and months" following vaccination is ambiguous. But, it does provide support for the fact that Petitioner continuously complained of pain from the day he received the flu vaccine moving forward. Petitioner's affidavits, coupled with Ms. Bode's account, is sufficient to meet his burden that it is more likely than not that he experienced pain starting on the date of his flu vaccination.

### 2.   DMSO use

Petitioner explained that he "did not treat with a provider [] from December 8, 2014 until September 12, 2015, because [he] was using [] DMSO, which was providing some relief." Pet'r's Ex. 17 at 2. However, Petitioner's inconsistent recollection of his DMSO use does not provide a particularly helpful context. Indeed, it is not clear when Petitioner began using DMSO. Petitioner wrote that "[f]our months after the shot," his pain "increased and the throbbing [became] more pronounced at night[,] which prevented [him] from a full night's sleep." Pet'r's Ex. 15 at 2. Petitioner wrote that he began applying DMSO "nightly" due to increased pain four months post vaccination in February 2015. His testimony, however, is wholly inconsistent with other evidence. *See* Pet'r's Ex. 17 at 1; *see also* Tr. 19:3–6. In fact, Petitioner testified that he began using DMSO "six, eight, [or] ten months[]" post-vaccination. Tr. 19:3–6. This point is corroborated by Petitioner's evidence of a receipt for his July 2015 purchase of DMSO. Pet'r's Ex. 16. He maintained that this was not the first time he purchased DMSO, he just did not save the receipts for his prior purchases in February and April 2015. Pet'r's Ex. 17 at 1. While the singular July 2015 DMSO receipt is not determinative by itself, it is persuasive in light of Petitioner's own testimony that he did not begin using DMSO until between six- to- ten months post vaccination. Petitioner's assertion that he began using DMSO six, eight-, or ten-months post vaccination is also closer in time to his estimation that his pain became more severe in April or May. *See* Tr. 43:1–3. Based on the inconsistencies in the record, I cannot find it is more likely than not that Petitioner began using DMSO for his left shoulder earlier than in April 2015.

### iii.   Diminished Job Capabilities Over Time

Petitioner's co-worker, Ms. Smith, provided credible testimony on the issue of Petitioner's decrease in job capabilities around April 2015, which is corroborated by other evidence. Petitioner testified that his pain increased around "April and May[.]" Tr. 43:1–3. He admitted that he began complaining to another co-worker, Ms. Bode, that he was having difficulties performing his usual physically intensive work duties due to his pain and limitations in ROM around "six, eight, [or] ten months[]" following receipt of his flu vaccine. Tr. 18:14–19. Six months following Petitioner's October 17, 2014 flu vaccine was around April 2015. Eight- or ten-months following Petitioner's flu vaccine was around June and August 2015, respectively. Ms. Smith corroborated this point and noted that she began noticing Petitioner could no longer move one arm without the other "well past flu season . . . sometime in the summer." Tr. 64:2–3. She based this opinion, in part, on the fact that she too observed Petitioner "start[ing] to become limited in what he was able to do [around the office] . . . [in] spring or summer." Tr. 67:13–16. The description of Petitioner's declining job

capabilities over time provided by Ms. Smith and Ms. Bode is consistent with Petitioner's own report of an increase in his pain, which began on the day he received the flu vaccine and came to a head in April 2015.

Ms. Smith's testimony regarding the timeline of Petitioner's declining job capabilities around April 2015 is also consistent with other evidence at the start of Petitioner's DMSO use. *See* discussion *supra,* Section IV(a)(ii)(2). Petitioner admitted that his shoulder pain limited his abilities during the workday, but that DMSO provided relief to an extent. *See* Pet'r's Ex. 15 at 2; *see also* Pet'r's Ex. 17 at 1. He also admitted that over time, DMSO became less effective at alleviating his pain so that he could continue with his work duties. Pet'r's Ex. 17 at 1. Ms. Smith's testimony regarding Petitioner's pain and limited job capabilities increasing "in spring or summer [2015]" is supported by the evidence. Indeed, Ms. Smith's testimony provides support for Petitioner's timeline that his pain began on the day he received the flu vaccine and continued to get worse over the "days, weeks, and months" following vaccination, which caused him to use DMSO during the workday so he could work through his pain with minimal modifications to his assignments.

### iv.  Petitioner's Day-of Vaccine Reaction

#### 1.  Immediate exclamations to co-workers

While the other available evidence in the record supports Petitioner's assertion that he experienced left shoulder pain following his receipt of the flu vaccine on October 17, 2014, Petitioner's immediate exclamations to his co-workers do not.[15] Indeed, Ms. Smith attested that while Petitioner reported shoulder pain immediately following his receipt of the flu vaccine, she "thought [Petitioner] was teasing and playing a prank on the person who went [after] him because they are afraid of needles." Pet'r's Ex. 10 at 1. When asked why she thought that, Ms. Smith explained that Petitioner "makes jokes often," and "[t]here were a lot of people nervous about needles in line." Tr. 58:6–13. Petitioner corroborated this point and admitted that he was trying to "mess with" those still waiting in line regarding how much pain he experienced after his receipt of the flu vaccine. Tr. 14:18–25. He conceded that he was "just kidding with them" and while he did experience pain, "it wasn't the kind [of pain] that [he] would say, 'don't get your shot' . . . [it was] just a shot." Tr. 14:23–25. Ms. Smith specified that Petitioner did not report his left shoulder pain directly to her immediately following the injection, but rather to the entire group of people still waiting to receive their shots as part of the prank. Tr. 57:20–22. Petitioner also stated that he was

---

[15] Petitioner asserted that he suffered from a rather immediate reaction the same day he received the flu vaccine on October 17, 2014. He described a "sharp" pain in his upper left shoulder and a red welt at the injection site. Petitioner testified that the pain "didn't increase and get worse . . . [it] was just a little bit of pain . . . ." Tr. 11:18, 16:25. Indeed, the throbbing pain associated with a red welt complained of by Petitioner immediately post vaccination is not in line with the type of injury one would expect from SIRVA. Instead, the inflammatory response that Petitioner experienced is inherent to the skin, not the muscle. Though, that is not to say that Petitioner did not also experience pain consistent with SIRVA following receipt of his vaccine. Still, Petitioner's complaints of sharp pain and a red welt at the injection site do not provide support for his claim that he experienced the onset of pain consistent with SIRVA within forty-eight hours of his flu vaccine.

speaking to the entire group regarding his pain, not Ms. Smith alone at that time. Tr. 15:21–25, 16:1–2.

Ms. Smith's testimony from memory of Petitioner's pain immediately following his receipt of the flu vaccine on October 17, 2014, is persuasive. Her immediate interactions with Petitioner in line where she observed him in pain and rubbing his arm are clouded by generalities and Petitioner's own concession that he was messing with his co-workers. In fact, not only did Petitioner say and act like he was joking, but his colleagues also believed he was joking. Furthermore, when he ultimately got serious, Petitioner still attributed the pain to that of a normal shot, and only later described the pain as more severe. *See* Pet'r's Ex. 8 at 1; *see also* Pet'r's Ex. 9 at 1. Petitioner's statements and actions to his co-workers regarding his pain immediately following his receipt of the flu vaccine do not provide support for his claim that he experienced pain consistent with SIRVA on October 17, 2014.

### 2.   Job performance immediately following vaccine

Indeed, Petitioner's own testimony casts doubt on his assertions that he experienced pain consistent with SIRVA on the day that he received the flu vaccine, but it is not conclusive. Petitioner testified that he continued to work his labor-intensive job for the remainder of the day after receiving his flu vaccine. Tr. 17:9–13. Petitioner explained that his job duties involved physical labor, such as moving furniture and other heavy items. He stated that following his receipt of the flu vaccine, he "went and did [the work orders] and came back and got additional work[]" from Ms. Bode. Tr. 16:17–19. Petitioner did not specify which tasks he received on October 17, 2014. But, based on Petitioner's testimony regarding his typical work assignments, it is more likely than not that his tasks that day involved building maintenance, physical labor such as moving furniture, and/or repairs around the office; a majority of which would require use of his left shoulder. *See* Tr. 8:6–12. Petitioner's ability to complete such strenuous physical activities seems to undermine his assertion that he experienced pain consistent with SIRVA on the day he received his flu vaccine.

However, in general, individuals can often work through a significant amount of pain, as each person's pain tolerance varies. I will not hold the fact that Petitioner continued working following his receipt of the flu vaccine against him. Indeed, there are numerous reasons to explain Petitioner's motivation to continue his work that day, despite his left shoulder pain. Petitioner expressed that he has a high pain threshold. Petitioner explained, and his witnesses agreed, that Petitioner performs a majority of the physical labor in the office. As a result, the office has come to depend on him. *See, e.g.*, Pet'r's Ex. 9 at 2. Petitioner also testified regarding his fear of being replaced at his age if he could not perform the tasks assigned to him. As a result, he feared he would not be able to find another job if he could not complete his labor-intensive assignments. Tr. 22:1–4. Therefore, the fact that Petitioner continued working on the day he received the vaccine alone is not determinative. Indeed, Petitioner's ability to continue his work assignments consisting of labor-intensive tasks on the day he received his flu vaccine does not negate his claim that he experienced pain consistent with SIRVA on October 17, 2014.

### b.  Inconsistencies in Evidence

The difficulty in following Petitioner's and his witnesses' accounts of his onset of pain, particularly due to the direct inconsistencies, is also evidence that should be considered in this case. As illustrated below, Petitioner's affidavits and testimony are inconsistent with each other, and with Petitioner's medical records:

| Month | Affidavits | Testimony | Medical Records |
|-------|-----------|-----------|-----------------|
| *October 2014* | Complaints of sharp pain immediately following injection; welt; redness, swelling, and throbbing around injection site<br><br>Believed reaction was normal pain associated with needle (Pet'r's Ex. 8 at 1); thought pain from shot was more severe than normal (Pet'r's Ex. 9 at 1) | Exclamation of pain and rubbing arm following injection was a prank on co-workers (Tr. 14:18–25); co-workers understood exclamations as a prank (Tr. 58:6–13) | No visits reported generally, or pertaining to left shoulder pain consistent with SIRVA |
| *December 2014* | Pain increased; limited ROM; could not reach arm at angle higher than shoulder or reach behind back to tuck in shirt; taking ibuprofen for pain (Pet'r's Exs. 15, 17) | Throbbing pain ranking at 3/10; decreased ROM – could not reach behind back to tuck in shirt or put belt on (Tr. 21:10–12); wife helped with tasks<br><br>Had normal ROM, could lift arm (Tr. 41:16–21; 50:2–3) | Examination showed normal ROM; no tenderness or deformities; purpose of visit was neck and chest pain |
| *February 2015 (4 months post vaccination)* | Increased throbbing pain at night (could not sleep); decreased ROM; said started DMSO (used at night, then also during workday as pain increased); reaching on impulse caused excruciating pain (Pet'r's Ex. 15 at 2) | Testimony refuted affidavits re: February 2015 (see below: "April 2015") | No visits reported generally, or pertaining to left shoulder pain consistent with SIRVA |
| *April 2015* | Affidavits were silent, or otherwise unclear/non-specific regarding pain during this time | Increased pain (Tr. 43:1–3); told co-workers of decreased ROM and job capabilities (Tr. 18:14–19); co-workers noticed job limitations (Tr. 64:2–3); started DMSO (Tr. 19:3–6) | No visits reported generally, or pertaining to left shoulder pain consistent with SIRVA |
| *July 2015* | Receipt for purchase of DMSO due to increased pain (Pet'r's Ex. 16); not first purchase of DMSO (Pet'r's Ex. 17) | Started using DMSO six- to ten months post vaccination (Tr. 19:3–6) | No visits reported generally, or pertaining to left shoulder pain consistent with SIRVA |

| *September 2015 (11 months post vaccination)* | Decreased ROM – any reach on impulse caused excruciating/debilitating pain (ranking at 10); could not reach behind back or raise arm away from side (Pet'r's Ex. 17 at 1–2) | Incident reaching on impulse for falling object; caused excruciating pain (Tr. 22:23–24) | Examination did not reveal deformities or tenderness; ROM showed marked limitation in all directions |

Based on the inconsistent evidence presented, Petitioner's account and timeline alone would be insufficient to establish by a preponderant standard that he experienced pain and limitations consistent with SIRVA within forty-eight hours of vaccination. However, Petitioner provided witness affidavits corroborating his account of his left shoulder pain beginning on the day of vaccination and continuing through the days, weeks, and months following receipt of his flu vaccine. Therefore, I find that the record supports that Petitioner more likely than not experienced pain and limitations in ROM consistent with SIRVA on October 17, 2014, the day he received his flu vaccine.

### c.   Credibility of Witness Affidavits

The affidavits and testimony submitted by Petitioner's co-workers generally corroborate that on October 17, 2014, Petitioner complained of pain in his left shoulder and developed a red welt at the injection site following receipt of the flu vaccine. The witness affidavits also provide support for Petitioner's assertion that his pain continued in the days, weeks, and months following receipt of his flu vaccine. Still, I must consider the manner in which the original witness affidavits were drafted and weigh them accordingly.

Indeed, the witnesses in this matter were required to submit supplemental affidavits due to the inadequacies I discovered in the original affidavits. Specifically, I found that identical template, boilerplate language was used in all three original witnesses' affidavits pertaining to Petitioner's pre-vaccination condition. *See* Pet'r's Exs. 8, 9, 10. Based on the use of this identical template language, the original affidavits lacked context and did not contain sufficient information relating to the onset of Petitioner's left shoulder pain. When confronted with this observation, Petitioner's counsel admitted that she wrote the original witness affidavits based on information communicated to her via email. As a result, I must evaluate the information contained in the original affidavits in accordance with this knowledge and weigh such assertions against the other persuasive evidence in the record, including inconsistencies in Petitioner's factual account, and the gaps in Petitioner's medical records.

Two out of three of Petitioner's witnesses submitted supplemental affidavits in support of the onset of his pain following vaccination. Pet'r's Exs. 12, 14. These affidavits appear to contain more personal details than the originals but must still be balanced against the original affidavits and the lessened credibility in those. Indeed, while Ms. Bode did not submit a supplemental affidavit, her original affidavit explicitly corroborates Petitioner's account of continuous and escalating pain post vaccination. It provides credible evidence of the onset of Petitioner's pain beginning on the day of vaccination when weighed against the other evidence in the record, including any inconsistencies in Petitioner's own account. Still, after weighing the available evidence, Petitioner's supplemental witness affidavits provide needed support for his claim that he

experienced the onset of left shoulder pain within forty-eight hours of his October 17, 2014 flu vaccine, which worsened in the days, weeks, and months following his vaccine.

## V.   Conclusion

There are significant inconsistencies in this record. But pain, and the ability to tolerate pain, are subjective and no one is in a better position to articulate the duration and severity of one's pain than Petitioner. In cases where a petitioner can articulate ways that he complained of and suffered from pain, such assertions are paramount and of extreme importance. Petitioner's corroborated complaints of pain immediately following his receipt of the flu vaccine outweigh the inconsistencies in statements and sizeable gaps in treatment in this case.

Indeed, individuals experience an endless variety of reasons for not seeking treatment with a medical provider at the first sign of an injury. I will not speculate as to the reason for Petitioner's personal decision to not seek treatment with a medical provider at the first sign of his left shoulder pain, as individuals react to injuries in different ways. It is true that Petitioner did not complain to his medical provider about left shoulder pain when he had his first opportunity to do so. In fact, he did not complain to a medical provider about left shoulder pain associated with his October 17, 2014 flu vaccine until approximately eleven months post vaccination. While these facts do not bode well for Petitioner's claim that he experienced pain on the day he received the flu vaccine, the standard here is a preponderance of the evidence. Petitioner has indeed provided some evidence that he experienced and complained of pain on the same day he received his flu vaccination. Based on Petitioner's account of his pain on October 17, 2014, in conjunction with Ms. Bode's congruous description of his escalating pain beginning on the day of the vaccine, Petitioner has provided preponderant evidence that he experienced pain consistent with SIRVA beginning on the day of his vaccine.

Based on the above reasoning, I find that there is sufficient evidence that it is more likely than not that after Petitioner suffered an immediate, superficial injury consistent with the trauma of vaccination, he experienced a gradual onset of left shoulder pain and ROM issues beginning on the day of vaccination, which continued to worsen in the days, weeks, and months following vaccination. Overall, Petitioner has met his burden by a preponderance of the evidence that he experienced left shoulder pain within forty-eight hours of his October 17, 2014 flu vaccine. Petitioner and Respondent have twenty-one (21) days from the filing of this ruling to file a joint status report indicating how this case will proceed.

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master